Council, Better Markets, Inc., Appellant. Mr. Hall for Appellant, Better Markets, Inc., Mr. Tarani for Appellate, MetLife, Inc., and Mr. Riley for Appellate, Financial Stability Oversight Council. Mr. Hall? Good morning. May it please the Court, I'm Stephen Hall, representing Better Markets, the Appellant Intervenor in this important case. This is a case, and by the way, if I may, with the Court's permission, I'd like to reserve five minutes of my allotted time for rebuttal purposes. This is a case about the strength and breadth of an extremely important right, the right of public access to judicial records, and the context is simply this. The District Court's decision below on the merits was to rescind FSOC's designation of MetLife for enhanced supervision by the Fed. That has huge implications for the financial stability of the United States, and yet over two-thirds of the entire record on which the Court based its decision is under seal. Moreover, the parties, when they made their case to the Court, relied very heavily on the sealed components of the record, and the District Court itself even cited to a sealed element in the joint appendix. The District Court's decision on our motion to intervene and for an application for an order to show cause struck a blow against transparency and against the public's right of access to judicial records, and we challenged four rulings that were embodied in the Court's opinion. First, the Court misread the language, the plain language of Section 5322 of Title 12 to hold that it actually superseded entirely the Hubbard analysis that's required by this Court. Second, it erred by suggesting that the joint appendix is not, in fact, a judicial record subject to the right of access. Third, it asserted that all of the redactions were, in fact, appropriate. It did so in a summary fashion, and it did so even though it had failed to gather any information necessary to actually make such a judgment. Fourth and finally, it adopted a novel particularized interest test for those who seek to intervene under Rule 24B for the purpose, limited purpose, of seeking access to records. I'd like to start on the legal issues presented with the role of Section 5322 D5A, which is the subject, a core basis for the District Court's decision and something that both appellees devote considerable attention to. As a threshold point, in our view, no matter what 5322, what its scope is in one sense, it certainly only applies to a certain universe of documents, and those are the documents that are submitted to the FSOC. And in fact, some of the elements of the joint appendix, which is the record in the case, clearly don't even fall within 5322. A prime example would be the proposed designation. That's a document that was quite obviously prepared by FSOC, not submitted by MetLife, and even if we accept the reasonable proposition that redaction might be appropriate for elements of that document that reflected data, information, reports submitted, the particularized analysis of that document, notwithstanding 5322. Did you say that even if it's undisputed that the material that's being redacted is just a verbatim quotation of a report that was submitted to FSOC and therefore clearly would fall within the scope of the statute for purposes of the proceedings before FSOC? Yes. We don't quarrel with the idea that if there are particular, to reflect the statutory language, particular data, information, or report elements that otherwise fit the standard and they're embodied in documents that were not submitted, that's a separate issue. But I would say that as a procedural matter, one of the reasons why Hubbard is so important is to make those judgments. There has to be a scrutiny by the district court to evaluate exactly what does and doesn't fall within the various possible categories of information. When you say it's a separate issue, you mean that the answer would be clear in that situation or the answer is not clear in that situation? What I'm trying to emphasize, Your Honor, is just that yes, there may be instances where data and information possibly deserves protection depending on how the Hubbard analysis pans out, but we concede it might be covered by 5322 even though it wasn't submitted in the sense of it came in a document that didn't come from a document submitted to FSOC, if you follow me. Does that answer your question? Yes. The court issue really is the plain language of Section 5322, and it's obvious on its face that it is very limited in scope. It only applies to, by its very terms, the counsel, the Office of Financial Research, and the member agencies of FSOC. And on that basis alone, there's no basis, in fact, for the district court's decision that 5322 would bind a federal court and would for all time prohibit any revelation of information. What about the idea that even if you're right about the statutory language, that the statute is a strong indication of Congress's recognition of the privacy, confidentiality, prejudice, business information, competitive harm that would occur from disclosure of this kind of information? In other words, it's a strong indication on the fourth and fifth Hubbard factors of where the court should go, really their alternative argument, which is under any possible conception or application of the Hubbard factors, the same result would occur here. It's a fair question, and of course it goes to the need for a Hubbard analysis, quite frankly. But my answer to the question, Your Honor, is that it is one indication of the privacy interest and Congress's view of its importance, and that has to be weighed in the mix. But it's not a particularly strong indicator of congressional intent or desire to protect secrecy, and I say that for the following reasons. On the face of the statute, it clearly contemplates a kind of limited scope in the sense that it preserves symmetry. The related provisions in Section 5322, for example, contemplate that privileges will apply. There will be no waiver of privileges by virtue of submission of information. In other words, this information may be protected when it's in the hands of the executive agency, and it is subject to FOIA, which in itself is something intended to promote transparency. But in a judicial context, there's nothing in 5322 that suggests it would carry over. So it's limited in scope, and it reflects, therefore, Congress's— I think just to stop you on that, they did also add in, though, including the FOIA exemptions that would cover this kind of information. That's specifically referenced also in the statute, too. Well, there is a reference to FOIA and its applicability. Again, an indication of congressional intent that there be transparency. The language says FOIA shall apply, including the exceptions. You're quite right, Your Honor. But there's nothing in the statute or in any case that suggests, which I think is where your question might lead, to suggest that FOIA or a reference to FOIA would supersede or overcome the well-established and presumptive common law right of access to that information once it's in the context of a judicial case. Right. I take that point. I think it's more music as you're applying the Hubbard factors, which is common sense, frankly, which is proprietary sensitive business information should not be dumped into the public domain without care. And courts don't do that, and the Hubbard factors reflect that. And I'm trying to figure out, again, I'm on their alternative argument here, how this kind of information could ever possibly be released by any district court applying the Hubbard factors. Well, I think there are really two important answers to that. This echoes the argument of the parties that it would be unthinkable that by invoking the right of judicial review, Congress would have intended that the confidentiality protections to the kind of business information you're referring to would have to be waived off. But that is hardly the scenario. That's a false premise. The fact is it is hardly unthinkable that Congress intended to protect the information, almost presumptively, it's very sweeping, it says all information submitted, regardless of whether it really is, in fact, business confidential. It's eminently thinkable that Congress said, okay, while it's in the hands of the agency, during its what you might call investigative process in this designation proceeding, yes, it's going to receive the protections of FOIA, but it's an entirely different situation, as evidenced by Section 53D5B on privilege when it goes to court. Now, doesn't that put a penalty on the company that's challenging the designation, which is if we go to court, this absolute protection that occurred that attached to our information before the counsel suddenly may not be so absolute when we go to court, and that is an arguable deterrent to challenging your designation. And I think the district court referred to that as, I don't know if the word was unthinkable, but something to that, in that sense. I think you're quite correct, Your Honor. The answer I would give is no, and the reason is that there really isn't any price, because our whole point is that the protections under Hubbard are robust. They're there. We did not come into court, into the district court and say, because they have sued to challenge the designation, there should be a wholesale unsealing of information. What we said was when the case goes to court, then a number of very important principles apply. There's a presumptive right of access that's well established and incontrovertible. Moreover, this court has made it abundantly clear that the obligation to protect truly confidential information while vindicating the public's right of access has to be done with a three-step process. The district court has to gather the information it needs on a particularized basis about the documents in question, about the asserted confidentiality claims. It has to evaluate and balance those, and then it has to articulate its reasoning with specificity. None of that was done. Let me ask you this, interrupt you there. On page 16 of the government's brief, they say, every document in the record that does not contain any of METWI's confidential business information or any confidential information submitted by state insurance regulators has now been unsealed in its entirety. Well, the first answer is we shouldn't have to take their word for it, Your Honor. The problem in this case fundamentally is that the district court did not have enough information to actually evaluate whether that claim undoubtedly made is really true. And quite frankly, we cited an instance in New York, the HSBC case, where the issue was whether a monitor's report pursuant to a consent decree or a plea agreement should remain confidential and sealed. And the court in its decision, part two of its decision, if you will, essentially said the report should in fact be unsealed, although it held that decision in bank's pending appeal. But it cited a almost classic example of information that the bank, HSBC, alleged was confidential, but it was completely benign. It really was not confidential at all. There are instances as well in this very case. And I can pull the... We can ask the government this too, but do you read METWI's confidential business information necessarily to mean information that fits within the scope of the statutory confidentiality provision, or is it a legal conclusion about whether it's confidential? Frankly, Your Honor, 5322 doesn't even parse it that particularly. In other words, 5322 says the test there is submitted. It's an incredibly broad brush, all the more reason for Hubbard to be conducted in earnest. I'm not sure I understand the thrust of your question beyond that. I don't know the... It's not entirely apparent to me, immediately apparent to me, what it means to say it doesn't contain any of METWI's confidential business information because we don't know how the determination was made as to whether that's confidential business information. That's right. Now, I think it may go to the question of, you know, what happens if a court does undertake a meaningful Hubbard analysis, it would then have the opportunity to weigh that very question as to each category of document. What is the nature of... Do you envision a document-by-document, line-by-line district court proceeding? Absolutely, Your Honor. It's the only way to vindicate this, what has been referred to as precious right of access. It doesn't mean that it can't be done... That doesn't happen in most FOIA cases, to use the analogy of FOIA. Well, with all due respect, Your Honor, I think that the FOIA officers at the various agencies take their job seriously. I'm talking about when the agency then comes to court, and the court's process is not usually to do what you just described. Well, candidly, I can't speak to those cases where FOIA denials have been subject to litigation and how the court proceeds. But I can say that the line of decisions in this court, from this court, make it very clear that exactly the kind of detailed, thorough analysis is required under Hubbard. And it may rise to the level of line-by-line. It may not, depending on the particular facts and circumstances. On the Hubbard factors, the final five, so the first is the need for public access. That's obviously what you're arguing for. The next five all seem to go against you pretty heavily, I guess. And I guess my questions are two. One, on any of those five, do you think they actually cut in your favor? And then on the first, can you explain the precise purposes or need that you think you have in the documents at question here? Happy to do a three-part answer, Your Honor. First is, it's really impossible to do a Hubbard analysis here and now without the benefit of much more information about whether, indeed, it is a bona fide confidentiality piece of information or a bona fide trade secret. It's simply impossible. But to take the premise of your question. But you're not going to see the documents when that's done. No, but we respect that. The district court is going to be doing that, and the district court. And I can take your point that you should go back to the district court. I take that. But the district court said it, was aware of everything, looked at everything, knew what was in the record. Right. And one of our arguments, frankly, and an important one, is that what that seems to be is an attempt to say, as an alternative holding, yes, I reviewed everything, summary statement to that effect. I concur with the party's judgment. That's in that language as well. And that satisfies Hubbard, as if there's a creation of a Hubbard light, if you will. And that's simply unacceptable, and it's not what the law requires. If you look at the progeny of Hubbard, starting with Hubbard and thereafter, it is imperative, for example, in one case, this court said, that the court articulate with specificity its reasons. It has to ask the appellees to come forward with justifications. That simply wasn't done in this case, and nothing in the record. The argument about that is that the court just didn't apply a Hubbard test at all. That is, that the court adopted the position of the parties that this stuff was protected, and then concurred in the judgment that this stuff was protected, but that it didn't actually apply a Hubbard test. Is that correct? That's correct. And the court itself says it did not, quote, reach that framework. There's no dispute that the court did not conduct a Hubbard analysis. But what's troubling is, in the second of its core holdings on the merits of our attempt to gain access to the record, the district court said, in effect, it's been said that I didn't conduct an independent analysis, and I just, you know, relied on the parties. That's not true. I have reviewed the record and the briefs. I concur in their judgment, period. That is not a Hubbard analysis by any stretch. It doesn't reflect, in fact. It doesn't seem to me the court was purporting to do a Hubbard analysis. The court was just saying, I looked at the documents, and I agree with the parties not to release them. Our concern is that that could be read, Your Honor, to suggest that a district court would have the discretion to avoid a Hubbard analysis, where in our view it's clearly required, and yet go with something much more skeletal and summary that falls well short. We want to challenge that head-up. Is it fair to say that would be appropriate if we adopted the parties' view that the statute protects all this stuff, but not appropriate if we adopted your view that Hubbard applies? I'm sorry. Once more, Your Honor. I think you're resisting something here that you don't know. It's a helpful question. You're resisting something else. I'm actually thinking back to try to finish Judge Kavanaugh's question, and I apologize, Judge Garland. I think Judge Kavanaugh has answered it. Very well. But you did raise a fair question about Hubbard and where it actually points in this case, and I reiterate my first response, which is you can't do it. There isn't enough information, but let's take them in turn. I think you yourself posited that, yes, the need for access here is compelling because of the historic nature of the case. That's one of the factors that weighs very heavily in this Court's decisions applying Hubbard. With respect to prior access, it's impossible to know which way that goes. We have a huge swath of 2,000 pages of information. We have six volumes summarily withheld as voluntarily submitted information. Who knows what's in there that may or may not have been exposed to public view in the past? There's been no analysis of that. The third factor is the identity of the objector. Even that is a mixed question, frankly. Certainly relative to the holding in Hubbard, there's no third party whose privacy interests need the particular solicitude of the Court. In Hubbard, of course, there was a church where a search warrant had been executed. It wasn't under indictment, and the Court was very keen on protecting the Fourth Amendment issues for that ancillary party. Here we don't have that. That cuts in our favor. Moreover, it isn't really true that MetLife and SSOC agree on the objections.  Well, there's evidence in the record that SSOC basically said, we're going along with MetLife here. So you don't even have a situation from the standpoint of who's objecting of two parties objecting, two against one. It isn't that case. It's much more murky than that. The fourth factor is the privacy interest. And here, I think, goes exactly to Judge Srinivasan's point. There's no way to evaluate the privacy interest, the magnitude of it, what it applies to, unless you know what precisely they're claiming. Is it the secret for Coca-Cola? Is it a real trade secret? Or is it a very general comment, as it was in one of the cases on January 27th? MetLife filed a revised set of briefs in light of the fact that they had decided to spit off a business unit. And if you look at the few bits and pieces that were unredacted, some of it goes to things like, well, we were concerned we might have to make structural changes, or we might have to consider breaking up. Does that count as bona fide confidential trade secret information? Clearly not. The only way to sift through all of that and evaluate that fourth factor is to do the kind of analysis that wasn't done here. The potential for prejudice, I think, as you said, is linked to that, and it partakes of the same consideration. Isn't the overarching view of this, and this is where the statute kicks in, I suppose, is a company's being looked at, and they have to provide all this information. All this information comes from state insurance regulators elsewhere. And then if they challenge that, a lot of that information then goes to the court. The idea that all of a sudden to challenge that all that business information has to be let loose on the public when it otherwise wouldn't be seems problematic in the grand scheme of how this statute was supposed to operate. I think that was what the district court was getting at. I still think, you know, maybe I'm speaking out of turn, but I think almost any district judge applying the Hubbard factors in this kind of situation has come to a similar conclusion because it's all this sensitive business information. That's the whole point of this statute, right, is to look at the sensitive business information and make a conclusion about the company, and then it goes to court if the company is so designated. Well, again, Your Honor, we submit that the courts are eminently capable of balancing the public's right of access with whatever legitimate privacy concerns may exist. There's a different mechanism to be sure. It's not necessarily weaker or punitive in any sense. And frankly, in terms of the – well, I'll leave it there. Your basic response, which is not a bad one, is let the district court do Hubbard, don't do Hubbard yourself. That's absolutely true. And that's consistent with the vast majority of the holdings from this court applying the Hubbard case. And, in fact, I think MetLife has submitted the Hardaway case for consideration, and we submit that's eminently distinguishable. First of all, it certainly confirmed the general principle that it's an abuse of discretion not to conduct a Hubbard analysis. Moreover, it actually did remand in that case for potential future Hubbard analysis with the exception of one document, a medical record, that it decided then and there should remain confidential. That's an easy case. That's nothing like the case that we're dealing with here before us, or Hubbard for that matter, where there were about 50,000 pages of documents seized from the church. The district court lamented that it's a significant task to review all that, but it's what justice requires. And that's, in fact, the law. Other questions? Do you want to wrap up, or have you wrapped up? Well, I'm not sure if I have any time left for rebuttal. Well, then you'd better sit down and say whatever. I think I shall. Thank you very much. We'll give you some time. MetLife now. May it please the Court, Amir Tehrani for MetLife, Inc. When Congress enacted Dodd-Frank, it expressly guaranteed the confidentiality of data, information, and reports submitted to FSOC during its designation proceedings in order to facilitate a free flow of information between companies under consideration for designation and their state regulators, on the one hand, and FSOC, on the other. Federal markets' request to unseal the record would eviscerate the plain statutory language and upend Congress's carefully calibrated statutory framework. Can I ask you about this careful calibration, because it's confusing me a little? Not your statements, but the statutory language itself. You have A, B, and C in front of you. I do, Your Honor. Okay. So A says, as Federal market says, that the counsel and the agencies shall maintain the confidentiality of any data submitted under this. Then B says, which is about retention of privilege, refers only to non-publicly available data, suggesting, at least to me, that there's some distinction between any data and non-publicly available data. So let me just start with that. Do you agree that Congress is referring to two different things in these two places? I think that would be a reasonable reading of the statute, Your Honor, and the availability of the guarantee of confidentiality in D-5A does not depend on whether the data, information, or report was previously publicly available. Congress recognized the need for a broadly applicable statute. So I was thinking about it the other way around, which suggests that the submission of non-publicly available data doesn't waive any privilege, which by negative pregnancy suggests that the submission of publicly available data does. Otherwise, there would be no reason for Congress to have stuck in the non-publicly available language. What about that? The non-publicly available modifier is a limitation on subsection B, but subsection B is not at issue here. Subsection B would come into play if this were a case where FSOC were not a party and MetLife as a defendant, for example, were resisting a discovery request. How do we know that B doesn't apply to this case? But there's nothing in here about. In fact, it says it doesn't waive any privilege arising under federal or state law, including the rules of any federal or state court to which the data or information is otherwise subject. So at least in the language, it suggests that once you get to court, the submission of non-publicly available data, you don't waive whatever privileges you have, but there's no protection of publicly available data. Why is that reading wrong? Your Honor, MetLife is not depending on its privileges that may be available to it under federal law or under state law to resist the request to unseal the record. What MetLife is invoking is the guarantee of confidentiality in D-5-A. So that's what I'm confused between the relation between A and B, because B sounds like what it's saying is that there isn't some kind of absolute confidentiality privilege, but rather the requirement that the agency keep the material confidential preserves whatever other privileges, including confidential business information, that the company has. Otherwise, I don't really understand the point of B. B would apply, Your Honor, if MetLife were resisting discovery and the proponents of discovery were arguing that MetLife had waived a privilege, such as the attorney-client privilege, by submitting information to FSOC during the designation proceedings. D-5-B makes clear that MetLife did not waive that privilege or any otherwise available state or federal privilege by submitting information to FSOC during these designation proceedings. But with respect to the availability of the documents to the public in this suit, where MetLife is exercising its statutory right to challenge its designation, Congress spoke clearly to the issue in subsection A. Where is the distinction between this third-party discovery and a case like this, where MetLife came to court itself? I don't read that in B. I'm not saying you're wrong, but I'm trying to figure out what the distinction between these two. The distinction, Your Honor, is that in subsection A, Congress tracked a statute that this court had already construed as providing a blanket guarantee of confidentiality in litigation, and that's the statute that was at issue in Ray Field's case that uses a similar structure to establish confidentiality. Or any person. That statute has more language. This statute's limited to the counsel, the Office of Financial Research, and the other member agencies, right? That's true, Your Honor. And the statute at issue in Field's case, which was a provision of the Federal Election Campaign Act, provided that any notification or investigation made under this section shall not be made public by the Commission or by any other person. The definitional provision of the Federal Election Campaign Act made clear that the federal government and federal authorities are not persons within the meaning of this statute. This court nevertheless concluded that in Ray Field's case, the district court was bound by the confidentiality provision of the Federal Election Campaign Act and had erred when it denied a motion to seal that was filed by a party that was the subject of an ongoing investigation for campaign finance violations by the Federal Election Commission. Before we get to seal case, just help me through the last section of the statute, the Freedom of Information Act. So when it says that the Freedom of Information Act, including its exceptions, shall apply to any data or information submitted, do you think that means that if somebody files a freedom of information request that nothing that was submitted can be produced or just nothing that was submitted that falls within the exceptions of the Freedom of Information Act? The Freedom of Information Act would apply under standard procedures to the extent that the markets or another entity were to direct a Freedom of Information Act request to SDOT. So MetLife would be free to invoke the B-4 exemption, for example. Yes, but it wouldn't be free to, I take it, invoke what I would describe now as the 5A protection. Is that right? That's correct, Your Honor. So the argument that allowing the court to disclose it will ruin everything, how does that fit with the fact that the Freedom of Information Act ruins everything other than confidential business information or trade secrets or anything else that the Freedom of Information Act would itself protect anyway and which, as Governor Malinowski was pointing out, is already pretty much built into the Hubbard test? It is, Your Honor. A district court has a measure of discretion in applying the Hubbard factors. It's a fixed factor balancing test. SDOT, in entertaining a Freedom of Information Act request, would not have discretion in applying the B-4 exemption for trade secrets and confidential business information or the B-8 exemption for supervisory financial information. MetLife is confident that if a Freedom of Information Act request were directed to SDOT, that it would reject that request on the basis of the B-4 and B-8 exemptions. What Congress was concerned about in the second of litigation is that application of the standard common law factors affords district courts a measure of discretion to weigh the competing interests, and a company in MetLife's position that's under consideration for designation would have to think long and hard before disclosing to FSOC its most highly sensitive financial information if the only guarantee in place were a fixed factor balancing test. If that were right, if what Congress was really concerned about is the courts screwing up here, why don't they just say this? This would make it a lot easier. Why don't they just say that the courts, not just the council, but also the courts, can't have to treat this confidential? Congress enacted this provision, Your Honor, against the backdrop of this court's decision. And how do we know that? Is that something we just accept, or are you saying that that was in the legislative history? It's not in the legislative history, Your Honor. They probably have no idea about the field case. You really think that's true, what you just said? I mean, I'm not questioning. I would be making the argument if I were you, too. But the idea that members of Congress really knew about our decision in the field case, about the FEC statute? I think there is a presumption. And then use different language, even though they knew what the language in the field case was? Your Honor, I don't think the language is very different between the two statutes. Clearly, Congress recognized the importance of the designation process, and FSOC's power to designate entities, non-bank, systemically important financial institutions, is a centerpiece of Dodd-Frank. Isn't it more reasonable to assume Congress thought, courts know what they're doing with sealed confidential material. We don't need to micromanage how they handle that. Courts do know what they're doing, Your Honor. In other words, we assume Congress knew about Hubbard. Well, they knew. I doubt Congress knew about Hubbard. But Congress knew courts aren't just wildly disseminating confidential trade secrets. Congress enacted these provisions against the backdrop of this court's authority. And if there were not a blanket guarantee of confidentiality in D5A, then companies in MetLife's position would have to rely on the Hubbard balancing framework. And we're talking here about the most sensitive information about a company. It's balance sheet, it's contingency planning in the event that it... Well, that's all wild. You're going to win under Hubbard. It's also going to be an abuse of discretion. We already know that information. Your Honor, it would be an abuse of discretion. What is the cost to you? What is the principle concern to you if the rule to emerge were that Hubbard governs rather than a gloss on the statute that would extend the statutory provisions of judicial review? Your Honor, it's conceivable that in the future MetLife could be subject to redesignation proceedings. It's certain that other companies will be subject to designation proceedings. And those companies need to have assurance that if they're going to turn over their most confidential information, that that information will remain outside of the public domain. You're being appropriately diplomatic, but I think your concern is a wacky judicial decision. Hubbard only misapplied it. Wacky is a term of art here. Yes. We're familiar with it. We know when we see it. The other concern, Your Honor, is that FSOC would not be able to make a fully informed determination about whether to designate a company without access to the type of information that's under seal in this case. Well, that's required, right? The statute requires the companies to produce the information, doesn't it? It does, Your Honor, but FSOC did not invoke that provision. It's always better, obviously, to get things voluntarily, but FSOC has the right under the statute to get it without accommodation, without negotiation. I'm not saying that's a good thing, but they do have that power, don't they? That avenue may be available. It was not invoked here. It may be. The statute says may require. Isn't that right? The statute does say that, but there are limitations on how far that power could go. For example, part of what was submitted here were analyses that MetLife voluntarily put together as to what it would do in the event that it were confronted with a run by its policyholders that were trying to redeem their policies for cash value. That's something that FSOC did not direct a company to put together, but MetLife here felt that that analysis was informative and should be available to FSOC when it made the designation determination. If this court disagrees with the district court's application of D5A, then this court is well-positioned to apply the Hubbard factors itself without a remand, as it did last month in the Hardaway case, as it did in Hubbard itself, where the record of sealed materials encompassed 50,000 documents, and this court undertook the Hubbard analysis after developing those factors in the first instance and held that the district court had erred by unsealing the materials in the record. Can I ask you, just since we're running out of time, one thing I just want to narrow to this hypothetical. Now, it's not the problem in this case because I think the parties did a good job on it and the district court did a good job on it, but imagine that the district court's decision turns on information that was provided, that no one from the outside could understand whether the district court correctly or incorrectly decided without language in the court's opinion that is, and maybe just a small amount of language, but some reference in the court's opinion to confidential business information. Would it still have to be redacted? Under your theory, it absolutely must be redacted from the court's opinion. Is that right? Unless MetLife or the entity that submitted that information to FSOC gave authorization for that information to be disclosed? By the court. By the court. So we would have, we really would have complete secret law in this area. That is, no one would be able to know why the court decided what it did without, unless they are either MetLife or, I know this didn't happen here, but MetLife or FSOC. We faced this question in the classification realm and I don't think the courts ever reached the question of whether due process permits it to rest totally on something that is complete secret law, because in almost all cases we're able to persuade agencies to either declassify the relevant material or we're able to write around it. But this is not classified national security information we're talking about and I guess I'm worried about the implication of what you're saying, not for this case but for another, where it's essential to explaining the court's reasoning to rely on not even confidential commercial information but just any data that was submitted under this subject. Your Honor, even endorsing the district court's reading of E5A, there would be extensive information that is not covered by the confidentiality protections of that provision. For example, the district court's analysis of FSOC's regulations and whether FSOC was required to be able to explain the law but not how it applies to the facts. But imagine that there was some data, information or reports, submitted under this subchapter that was otherwise publicly available and that was not confidential commercial information, something that would be released under FOIA. And the court needs to explain that in its opinion. If I understand your position correctly, the court cannot cite that even though the markets could get the same information, although they couldn't get the court's opinion, but they could get the same information, and that freedom of information in that case. Is that your position? That's true, Your Honor. There is no exception in E5A for information that's already publicly available because Congress recognized in this setting that the interest in confidentiality and a fairly and efficiently run designation process outweigh the public right of access. Not just the public right of access, but the right of the court system to explain its cases and opinions. If it weren't for that, you would have a pretty strong case here, it seems, I think. But when you think about what Congress didn't say, that is a very big step to say courts can't explain themselves by reference to the facts without saying that in the statute. Your Honor, the district court here rescinded Metlife's designation based on grounds that have little or nothing to do with the material in the record. The district court also gave the parties the opportunity to request redactions. Neither party did, and she made a point. That's why I say I think everybody did a good job in this case, but as you know, what we decide here is going to cover the next case, not just this case, if we're deciding a law question on this one. That's true, Your Honor, and Congress made that determination itself when it enacted the broad, unequivocal language of V5A and determined that that type of across-the-board protection is necessary to ensure that FTOC can do its job. Thank you. Thank you. We'll hear from DOJ now. May it please the Court, Nicholas Riley for the Financial Stability Oversight Council. I'd like to just start with the question that you left off on, just because I think the government's answer might be slightly different, and I think it's helpful just to look at the text of the statute just to begin there. So the government's reading of this provision, VA, is not that all data information and reports submitted to the council in the course of one of these designation processes must remain confidential permanently. Our view is that the council's statutory duty under this provision is to maintain the confidentiality of the information that it receives. So the council's not expanding the universe of confidential information. So Your Honor was alluding to if there's information out there that's already public. No, I mean if the parties submit to the agency public information, do you have an obligation to keep that confidential? Right, and I think our view is no, because the council's only duty is to, again, maintain the confidentiality. I see, maintain. So that's why I'm saying- It doesn't otherwise have to be confidential. That's right. Whatever confidentiality otherwise exists. That's right. And, in fact, in this case, I think there's an example of this, which is, you know, as we know, some of the information that remains under seal came from not just NetLife but from state insurance regulators who provided it to the council on the condition that it remain confidential. The council treated that information as confidential pursuant to memoranda of understanding that it had with these regulators. In one instance, I believe one of these regulators subsequently made some of the information, some of the documents that it provides to the council available on its own website, and at that point the council stopped treating that information as confidential. So, again, I just want to be very clear that- No, that's very helpful. On the ultimate question of our own opinions in the case in which we decide either is too big to fail, isn't whatever, do you agree with NetLife, though, that we can't explain our opinion in a way that- or the district court can't in a way that references information that is confidential, even if it's not, for example, trade secrets or something like that? I think that's right, and I think that's what Congress specifically contemplated when it enacted this statute. Again, we're talking here, and I think Judge Kavanaugh alluded to this with one of his questions. We're talking here about a process where the council's statutory duty is to look at some of the very most sensitive business type of information that these companies possess. That's what's necessary in order for the council to perform its statutory- How are you applying the statutory word confidentiality? Because something that's already public is not confidential because everybody agrees with that, but if there's something that's released to you that's not a trade secret, are you saying that FSOC makes some kind of independent assessment of whether it's nonetheless confidential? I think in practical terms, again, the statute doesn't actually define confidentiality in this context, but I think Congress did leave that judgment to the council. In this context, though, because the parties worked together to actually make all of- with respect to the documents that are essential to this litigation, the final determination, the hearing transcript, all of these documents, because they did make so much of that public, all the non-confidential parts public, as a practical matter, I don't know what independent analysis FSOC would have had to have done in this case because- Just to, again, follow up on this question. Do you think confidentiality means more than just it's not publicly available? Some things are trade secrets and some things are not. Some things are confidential business information that fit under the two FOIA exemptions. Is this some kind of shorthand for those FOIA exemptions? I don't know that. I'm not reading it. I don't think the government reads it as being shorthand specifically for the FOIA exemptions. I don't think this is necessarily like a one-to-one relationship, that confidential in Section DA equals the FOIA exemptions. What I think it means to answer, it sounds like your initial question, is in terms of whether confidential means simply non-public. I think it could mean something else, but in this context, I'm just giving you an example of the type of information that I don't think the council would treat as confidential, for instance, information that was already public. Can the court disclose the publicly available information that was submitted to the council and put into the joint appendix? The publicly available information, I think absolutely. Even though it was submitted? Yes. Again, I think that what's relevant in this section, Section DA, as we've been calling it, is that the council maintain the confidentiality. Do we know whether the district court did that or not? I guess I'm not sure exactly how to read the district court's opinion, but I thought they adopted MetLife's view about this, in which case they didn't separate in the way that you're separating the meaning of the word confidential. No, I think we very much agree with MetLife's reading of the statute. I think regardless of how one reads DA, I think what the district court did was correct, which was saying that if Congress has provided a statute requiring the confidentiality of certain information, and, again, we're saying that information is information that is, in fact, confidential and that was previously not made available to the public, others may read that differently. But either way, the district court's view that when Congress has provided that certain information must remain confidential, that that obviates the need to engage in the public. I'm sorry, because I hadn't anticipated this argument. I'm trying to process it. For information that wasn't confidential before but was merely submitted, I don't know whether there is anything in this category, and then is put into the joint appendix, can that be disclosed by the district court? I think it can. I think it can. Because it wasn't confidential. That's right. And whatever confidential is, it's probably labeled as confidential when it's given to the council. I think that's right. Again, the statute is false. As you understand the fact of this case, there isn't any work that the district court would have to do in that regard because none of that stuff is redacted anyway. With respect to the documents that are central to this litigation, again, those being the final determination, the transcript and MetLife's hearing before the council, certainly all the briefs that were filed below and here on appeal, in the earlier appeal and in this appeal, I think that's right. Because the parties have gone through in this line-by-line, in some instances word-by-word manner, to identify what is confidential and redacted in this fairly tailored way. Now, there are some other documents, obviously, that are part of the joint appendix here, such as MetLife's voluntary submission to the council. And this, I think, addresses both your question, Judge Srinivasan, and your question about our statement on page 16. I think all of those other documents contain confidential information. Now, the government did not go through those documents in the same line-by-line. The parties did not go through in the same line-by-line, word-by-word fashion that they did with respect to the final determination and some of the other key documents in this case. But they did look at each of these documents and find that there was large volumes of confidential information. So they respond to that that you, I think, A, how do we know? How does the district court know? And B, shouldn't it be gone through line-by-line? So do you want to respond to their arguments on that? I think that was their response. I think that's right. And with respect to the first point, how did the district court know? The district court knew, and the district court told us that it knew because the district court, at the point where it resolved Better Markets motion, had at that point decided the summary judgment motion and had to go through the joint appendix at that point. And so I think we can take it on fairly good authority when the district court says, at page, this is at JA31, said that she conducted a, quote, independent evaluation of these materials. With respect to the second point, should the parties have had to have gone through those other documents line-by-line? I think the answer is no, and I don't think that's what HUBR requires. I think if what Better Markets really wants here is this line-by-line type of redaction log, like the time that they outlined in their request in order to show cause, the mechanism for doing that is FOIA. What they're requesting is, I think, very similar to a Vaughn index, and there are procedures for going about getting that if that's what it wants. But I think HUBR did not require that. Can I interrupt you there? You said something earlier, and I just want to make sure I follow up on this. You said the parties made all the nonconfidential items public. I think I have that right. What does nonconfidential mean there? Just to clarify the earlier statement, I was talking about, again, those documents that were central to litigation, so, for instance, the final determination. And I think there what we're talking about is documents that don't fall into one of the two categories of confidential information that are issued here. One, and I think the largest, as the Court has been discussing, are documents that are information that is met like proprietary sensitive business information. Let me just pause there. Information from the company that they say is confidential information. They turn it over. The counsel has to maintain the confidentiality in the Court, whether under HUBR or under the statute, shouldn't release that stuff unless they agree. Is that right? I think that's right. Right. And, again, the counsel is exercising some judgment here, as I mentioned earlier, in instances, as with the state regulatory information, the counsel does exercise some judgment as to what's confidential and what's not here. But I think the way you framed it is exactly right. The other category of information I see that my time is up. State insurance regulators. Exactly. It's the state insurance regulators. The same thing there, that if they label it as confidential information, counsel has a duty to maintain that. The Court shouldn't go on its own frolic. It should respect that as well, whether it's HUBR or the statute. I think, generally speaking, yes. Generally speaking always makes me scared. Sure. The reason I say that is because, as I mentioned earlier, in this case, there was information that was turned over and designated as confidential by a state insurance regulator that that regulator subsequently put on its website. Okay. But that's the regulator saying, you know, we gave you something that was confidential. We no longer think it's confidential, so you can have at it. That's right. But I think the reason I bring that up is because, in that case, it's not as though the regulator, you know, notified the counsel that it was doing this. The counsel saw that this information had been disclosed and then made the decision that it wasn't confidential. But, yes, to answer your primary question, I think that is what non-confidential means. So their argument also is, at a real formalist level, hey, the statute doesn't speak to the courts, so this should be done under HUBR rather than the statute. And you may get to the same end result, but we should follow the right steps here under the statute. What's the harm? I know your legal argument responds to that. What's the harm from doing it that way in your view? I think the harm is twofold. For one, it impedes this kind of second guessing that Better Markets is suggesting that courts engage in here would, I think, have the chilling effect that we described in our brief of making both companies and third-party regulators less forthcoming in the information they provide to the counsel. Okay, so it harmed the counsel, this is important, harmed the counsel in its performance of its statutory duties, you fear. Yes, that's right. Is that a realistic fear? I think it is. I mean, I think this case actually to some extent illustrates that because we're talking here, again, as I think Judge Garland alluded to and Mr. Tarani made clear, the information we're talking about here, much of it was made available by MetLife voluntarily to aid the counsel in its process. Much of that information included information, much of the information that MetLife provided voluntarily included data and information that MetLife found sensitive and proprietary. If that wasn't protected, the counsel would have never received that. Okay, and you had, I think, another response. Right, it was just a broader point, which is that I know there's been a lot made about the public's interest in accessing these documents. The public also has an interest, I think, in judicial efficiency. And in this particular case, I think it's important to situate ourselves in terms of how the litigation actually progressed at the point where Better Markets is now asking for this information in these other documents to go through and have the parties go through line by line and redact them. You know, this is information that the district court has already told us it didn't rely on and to force the district court to go through thousands of pages in doing this when it's not actually going to facilitate the public's understanding of her decision, I think, you know, there's a reasonable interest in judicial efficiency there. Can I ask you a question about the mechanics of the confidentiality process just for a second? So it sounds like if an entity submits something and designates it as confidential, then it's not accepted at face value because at least you identified one situation in which there's pushback from that stuff. And that's a situation in which the agency would say, well, that's already public. So how can it be confidential? Is that the... Again, I'm talking about, I think that's generally right. That's how it worked in this case. This is the first case that has proceeded to litigation. And so, you know, this is all that I really have to go on in terms of what the counsel... Yeah. And my question is, and there may not be any answer because this is the first time because there aren't fixed rules, but just based on your understanding of the practicalities of how this plays out, is there the possibility of pushback on the ground that, well, it's not... You're designating this confidential. It's not that it's already been made public. It's just that we don't understand why this would have to be kept confidential. You know, I think if you're... If we were at the administrative stage and this hadn't yet proceeded to litigation, I don't think that... Are we talking about in a situation where this has proceeded to litigation? Because the reason I say if we were at the administrative stage, I don't think there'd be a need at that point given the counsel's general duty and, you know, just the way this is operating for the counsel to go and really push back. And I think there'd be a disincentive for the counsel to do so because it wants full and frank discussions with these companies. If we are in litigation, again, this is the only case that we have to go on. And in this case, because the parties preemptively on their own made this information available, I'm not entirely sure what would happen. You drew a distinction at one point between information in the sealed appendix that was central to the court's decision and other. What's the other? Right. So the other, I think, is largely made up of these large submissions that MetLife made to the counsel voluntarily that contain information that MetLife wanted the counsel to have in the course of making its designation. Now, the counsel's final determination, I want to be very clear, discusses those submissions to the extent that it can and, you know, in places where it makes reference to specific numbers or data or information that is proprietary. What's the difference in terms of the way the parties or the court treated that group of other material in the sealed appendix? Right. Well, I think, for one, the district court tells us in the ruling below that she did not rely on a lot of that other information. Well, I assume that's information she didn't rely on but nonetheless was in the record. What did she do with respect to looking at that to determine whether it was still confidential or was confidential or anything else? Right. Well, she tells us in her order here at JA-31 that she performed this independent evaluation of all of the material. It doesn't tell us how she evaluated it. You were drawing a distinction. I'm just asking you what was the distinction. You seem to be saying that a much closer look was taken by the parties of the material on which the decision was based as compared to the material that it wasn't. Is that correct? Am I right about that? That's right. That's with respect to the parties. Again, I don't know. You don't know what the court did. That's exactly right. Okay. Fair enough. Okay. All right. Thank you very much. I'd like to exercise my discretion here and here from MetLife just on that one question. I'd like to know whether you do have a different position on what maintain confidentiality means and if you do, if you want to give a sentence or two explaining why yours is the better position. We do have a different position, Your Honor, and we believe that D5A applies without regard to whether the material was previously in the public domain because Congress wanted to ensure that companies would be confident in submitting their most sensitive information to FSOC. And if FSOC had the discretion to make that type of item-by-item determination as to whether the material was already publicly available, then companies would be chilled in their willingness to submit their highly sensitive proprietary information to the agency. Okay. Thank you. I know there's no time left. We'll give you two minutes, okay? Thank you. Just very quickly. It's probably going to be more than two. I know. I always say that. So there's some idea. I appreciate it. A number of quick points. On the issue of what is the state of this record in terms of its opacity and to what extent did the district court rely, a clarification and then an implication. Yes, the district court decided to define a judicial record essentially in terms of what the court relied on in its opinion and suggested that there was nothing that couldn't be understood based on that sort of definition and approach. And we submit, number one, that's not the case. In fact, there's still significant opacity even under that sort of restrictive view of what is a judicial record. The parties themselves in making their case to the court cited 90 times, this has met life in its two briefs, on the merits 90 times to sealed information. And as I mentioned earlier at the outset, the district court itself, although it said there's no basis for my decision, it cannot be seen, there is a citation in her opinion at J94-95 and footnote 8 to a document that she found, quote, very interesting that is, in fact, still under seal. With respect to opacity, it's also true that even at the appellate stage, counsel for met life relied significantly on oral argument on the Oliver Wyman report on its face, highly germane to this case because it talks about the adverse consequences of financial instability. I don't want to interrupt you. Well, let me round out. The point I wanted to make was there's an extraordinary amount of opacity still. That's why we advocate for going back to the core definition of what's a judicial record here and subject the entire joint appendix to a Hobart analysis so we don't have to mind read, we don't have to play games about what the court did or didn't rely on. And finally on that, the virtue of using a relevant standard is that the public is also entitled to know what components of the record the district court decided not to cite or rely on. That in itself is a very significant thing. So I am going to interrupt now. So the FEC case, they argue, compels a ruling against you here because any person does not refer to the courts in the FEC statute. Your response? We have always taken the position, Your Honor, that the In Re Sealed case does nothing to undermine our position here. And the reason is the issue before the court in In Re Sealed was not whether or not sensitive information should or should not be unsealed. It was whether the FEC had the right to try and do that in a subpoena enforcement action. Those are two very different issues. And the court's opinion is quite clear in saying, frankly, although we view the section of the FECA as evincing a congressional, a significant privacy interest in the minds of Congress, the court said specifically it might actually be possible under Hubbard to conclude that notwithstanding the statute, that information should see the light of day. All it said was the agency itself could not in roguelike fashion come in and splay out on the public record what is classically sensitive investigative information. There's harsh language about the agency in that case. That is true of what they had done. Okay, next question. The government argues that this will harm the counsel's process and thereby thwart the overall statutory objectives here. Your response to that? One very concrete, one general. I would recommend that the court consult the motion to compel both the parties' briefs on that issue and the district court's order resolving it. What's apparent from the parties' briefs in the first instance is that neither FSOC nor MetLife actually regard 5322 as an absolute bar. In fact, MetLife itself belittled the claim that FSOC should be entitled to retain the information on so slender a ground as chilling discussions with state regulators. And the court itself, when it rendered its decision, said, in fact, whatever confidentiality interest is embodied in 5322, it must yield to MetLife's right to have review of the designation on a full administrative record. We submit the natural follow-on conclusion is it must also submit to the public's century-old right to know. Maybe you've captured this, but I think the point the government is saying is they're not going to be able to get the information they need to make good, correct decisions absent some assurance of confidentiality and the ability to thereby encourage more information to be submitted to the counsel. And that's a weighty argument. There are three arguments. One is, again, as a matter of statutory interpretation, in our view, 5322 just doesn't bind a court. It only applies to the agency itself, number one. Number two, we think in general, and there's evidence for it in this record and in HSBC, the notion that information is dangerously sensitive and cannot see the light of day is typically and often exaggerated. Not always. I don't think we can generalize on that. Well, I think we can say that it sometimes is, and that's precisely why a discriminating evaluation under Hubbard is necessary. Then my third question, I might have cut you off on your time. No, I'm fine. Okay. I think the argument is, yeah, you could do it under Hubbard, but it will always be an abuse of discretion for a district court to release anything that is otherwise confidential in the counsel process. So whether you go left or go right, you're ending up in the same place, which is this kind of material can't be disclosed. They prefer the statutory process because there may be district courts that jump the rails on occasion that causes problems. So what's your response to that general argument by the other side? I just don't think, again, we're sort of getting to the core issue, which is what Congress actually intended or said. It just doesn't follow that there's an absolute prohibition on information submitted to the counsel in the judicial context. What we're ultimately talking about is the fundamental presumptive right of access to judicial records and the extraordinary interest that that serves measured against, in this case, a sweeping allegation that this is just too sensitive to be exposed to the light of day without any kind of discriminating analysis and determination. That's what we're asking for under Hubbard. Other questions? I'll take them out of our submission. We'll take a brief break while counsel is playing musical chairs.
judges: Garland, Kavanaugh, Srinivasan